UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 08-80355-CIV-HURLEY/HOPKINS

RICHARD KURTZ,
a New Jersey resident,

    Plaintiff,

v.

GREGORY E. YOUNG, individually,
G.E. YOUNG, P.A., a Florida corporation,
EDWARDS, ANGELL, PALMER,
& DODGE, LLP, a Delaware limited liability
partnership, and RENNER, BURGESS, INC.,
a Florida corporation,

    Defendants.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO LAWYER DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON AMENDED COMPLAINT**

    Plaintiff, RICHARD KURTZ, by and through his undersigned counsel, hereby files this Response in Opposition to Lawyer Defendants' Motion for Summary Judgment on Amended Complaint, pursuant to Federal Rule of Civil Procedure 56 and this Court's Local Rule 7.5, and in support states as follows:

### I. INTRODUCTION AND FACTUAL BACKGROUND

    Federal Rule of Civil Procedure 56(c) provides that summary judgment should only be rendered where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law." The Eleventh Circuit has held that in determining whether there exists any genuine issue of material fact, the court considering a motion for summary judgment must view the evidence and all related factual inferences in the light most favorable to the party opposing the motion. See, e.g., Johnson v. Board of Regents of the University of Georgia, 263 F. 3d 1234, 1242-43 (11th Cir. 2001). Furthermore, the court must resolve all reasonable doubts concerning the facts in favor of the opposing party. Id. at 1243. Under this standard, even a

1

cursory review of the Lawyer Defendants' Motion for Summary Judgment on Amended Complaint, when read in conjunction with the allegations of Plaintiff's Amended Complaint and the evidence in support thereof, discloses ample existing genuine issues of material fact that render inappropriate summary judgment as contemplated by the Lawyer Defendants.

As the Lawyer Defendants' Motion for Summary Judgment frequently mischaracterizes the relevant facts of this case and the implications thereof, it is important to set forth a more accurate description of the events and circumstances giving rise to the instant action, especially given this Court's task, as described above, of resolving doubts relating to the facts and evidence of the case in Plaintiff's favor. Plaintiff's occupation involves the acquisition, development, and management of multi-family residential housing, shopping centers, office buildings, and other similar properties in the Northeast. (See Deposition of Richard Kurtz, December 4, 2008 ("Kurtz Depo.") at 5-6.) Significantly, Plaintiff's business does not involve the acquisition and sale of single family residences, nor has Plaintiff ever intended to purchase and sell single family residential property in the Town of Palm Beach as a source of profit for his business concerns. (See id.) It is undisputed that Plaintiff's sole intent with respect to any acquisition of residential property in Palm Beach was to purchase contiguous land with substantial water frontage for the purpose of constructing one single family residence for his own personal use. (See, e.g., Deposition of Susan Furman, December 3, 2008 ("Furman Depo.") at 10-11, 21; Kurtz Depo. at 92, 128.) In fact, prior to ever contracting to purchase any residential property in Palm Beach, Plaintiff spent a number of years researching real estate in the area to familiarize himself with the market and the available properties that would suit his preferences. Thus, the Lawyer Defendants' dubious assertion that Plaintiff bought real estate in Palm Beach "on a whim" or that Plaintiff "began buying and selling" land in order to "accumulate property" has no relation to the actual facts of the case. (Mot. Summ. J. at 1, 4.) Plaintiff's sole purpose for acquiring residential property in Palm Beach, which was clearly understood by everyone involved in the process, from the real estate brokers, architects, and engineers employed by Plaintiff to the Lawyer Defendants themselves (who were paid approximately $150,000.00 during their representation of Plaintiff), was to purchase contiguous waterfront property in order to construct one single family residence for personal use. (See Kurtz Depo. at 92, 128.)

To that end, as far back as April 2004, Plaintiff retained the professional services of the Lawyer Defendants to assist in the acquisition and development of adjacent waterfront parcels on

2

Lots 5 and 6 of Ocean Lane in Palm Beach. (See, e.g., Deposition of Gregory E. Young, December 9, 2008 ("Young Depo.") at 20-21.) After paying approximately $50,000.00 in attorney's fees to the Lawyer Defendants over a period of two years in an ultimately unsuccessful attempt to resolve certain zoning, planning, and configuration issues related to the construction of one home across the lots, Plaintiff determined that he would not be able to construct an acceptable home on the property. (See, e.g., Young Depo. at 35.) Thus, in the early part of 2006, Plaintiff put the Ocean Lane parcels up for sale and focused his attention on finding other contiguous waterfront property in Palm Beach on which he could construct his home. Contrary to the Lawyer Defendants' statements, to date, the Ocean Lane property remains the only property in Palm Beach that Plaintiff has "bought and sold." Furthermore, Plaintiff decided to sell the property only after spending nearly two years attempting to resolve the issues affecting his plans for a single residence on the lots, contrary to the Lawyer Defendants' disingenuous allegation that Plaintiff entered into property transactions "on a whim." (Id.) During this time, the Lawyer Defendants were intimately involved in the process and knew that Plaintiff's sole intent was to construct a single family home on contiguous waterfront property. (Id. at 34.)

Upon determining not to proceed with his plans with respect to the Ocean Lane lots, Plaintiff focused his attention on trying to find another property with significant water frontage on which he could construct one single family residence for his own personal use. Around that time, on or about February 28, 2006, Plaintiff was informed by his real estate broker of a "beautiful" and "charming" home on a single waterfront lot in the Via Vizcaya subdivision, specifically, Lot 1 on Via Vizcaya. (Kurtz Depo. at 22-23.) Plaintiff went to look at the house that morning and, although it was situated on only one lot and thus did not have sufficient water frontage to suit his intentions with respect to the construction of a new residence, Plaintiff determined that it would be a highly desirable home to reside in until such time as he could acquire a larger parcel of waterfront property in Palm Beach. (Id.) Shortly thereafter, it was brought to Plaintiff's attention that Lot 12 of Via Vizcaya, the waterfront lot immediately adjacent to Lot 1, had suddenly and unexpectedly become available for purchase.[1] (Furman Depo. at 18-19.) As Lot 12, when combined with the adjacent and contiguous Lot 1, would give Plaintiff a significant amount of waterfront property on which he could construct a single

---

[1] Plaintiff's agent did make an unsolicited overture to buy the home from the owner on behalf of Plaintiff at an earlier date.

3

residence for his personal use, as had always been his intent, Plaintiff entered into a contract to purchase Lot 12 on or about March 17, 2006. (Id.)

As he had with the contract to purchase Lot 1 and with the contract to purchase Lots 5 and 6 Ocean Lane, shortly after executing the contract to purchase Lot 12 Via Vizcaya, Plaintiff forwarded the contract to the Lawyer Defendants for their review and further advice and representation. (Id. at 20.) Throughout the course of the nearly four years in which the Lawyer Defendants represented Plaintiff in his efforts to acquire contiguous waterfront property to develop a single residence for personal use, during which time Plaintiff paid and the Lawyer Defendants accepted approximately $150,000.00 in attorney's fees, the Lawyer Defendants never once objected to Plaintiff's standard practice of executing a purchase contract and then subsequently providing it to the Lawyer Defendants. The Lawyer Defendants never refused to represent Plaintiff if he continued to provide purchase contracts to the Lawyer Defendants after executing them, nor did they ever advise him against doing so. Instead, the Lawyer Defendants continued to represent and collect fees from Plaintiff in his real estate transactions.

The Lawyer Defendants' contention that the liability for their negligence should be limited because they only had "an extremely narrow inspection period of less than ten days" (Mot. Summ. J. at 2) to retrieve and review documentary information pertaining to Lot 12 is specious for a number of reasons. First, if the Lawyer Defendants were not comfortable with their ability to perform the requisite work within the constraints of the contractual inspection period, they should have immediately advised Plaintiff that they could not represent him and returned the contract to him.

Second, the Lawyer Defendants could have alternatively requested an extension of the due diligence period, as they had previously done with respect to Plaintiff's purchase of the Ocean Lane property. (Young Depo. at 33-34.) The record is clear that the Lawyer Defendants did not make such a request with respect to Plaintiff's purchase of Lot 12.

Third, the Lawyer Defendants' insistence that they were not negligent because they did not have an opportunity to review the purchase contract before its execution is an irrelevant distraction. Plaintiff's action in the instant case is not based on a defect arising out of the contract or on some onerous contractual provision of which Plaintiff was unaware. In fact, it is undisputed that the relevant contract was based on the standard FAR/BAR real estate form contract. (Young Depo. at 93.) Rather, Plaintiff's claims against the Lawyer Defendants arise

4

out of the Lawyer Defendants' failure at any time until around November 2007, approximately 20 months after Plaintiff entered into the contract to purchase Lot 12, to advise Plaintiff that he could not construct one single residence across Lots 1 and 12 of Via Vizcaya, as was his intent. It is impossible to conceive how the Lawyer Defendants' failure to advise Plaintiff of the plat setback restrictions affecting Lots 1 and 12 until close to two years after execution of the purchase contracts for the lots could be blamed on the Lawyer Defendants' inability to review the contracts until shortly after their execution.

Fourth, assuming <u>arguendo</u> that some weight is ascribed to the fact that the Lawyer Defendants only had a "narrow" inspection period within which they were able to review the plat and other relevant records and materials affecting Lots 1 and 12 Via Vizcaya, the Lawyer Defendants have admitted that it took only one day to obtain the plat from the public records. (<u>See, e.g.</u>, Young Depo. at 81-82.) Moreover, subsequent counsel retained by Plaintiff in connection with the development of a single residence on Lots 1 and 12 when it became apparent that the Lawyer Defendants' representation was inadequate has testified that a cursory glance at the relevant plat immediately disclosed the existence of the plat restrictions prohibiting Plaintiff from constructing a single residence across the lots. (Deposition of Guy Rabideau, January 12, 2009 ("Rabideau Depo.") at 67.)

Fifth, based on the Lawyer Defendants' own testimony, the title commitment for Lot 1, recorded within and subject to the same plat affecting the Via Vizcaya subdivision, had already been received in the Lawyer Defendants' law office days before they received the Contract for Lot 12. (Young Depo. at 73-75.) Thus, the Lawyer Defendants' argument that they only had less than ten days to review the plat before Plaintiff's deposit became nonrefundable fails to explain why they were unable to spend a short period of time obtaining and briefly inspecting the plat, which would have revealed the plat setback restrictions. Nor does it explain why, even after the expiration of the inspection period, the Lawyer Defendants were unable to advise Plaintiff of the setback restrictions prior to the May 1, 2006, closing on Lots 1 and 12, which took place two months after Plaintiff executed the contract to purchase Lot 1 and over six weeks after Plaintiff executed the contract to purchase Lot 12.

The Lawyer Defendants' failure to disclose to Plaintiff the existence of the plat restrictions prior to closing, which would have given Plaintiff the opportunity to walk away from the contract losing, at worst, the amount of his deposit, is simply inexplicable. Equally

inexplicable is the Lawyer Defendants' failure to advise Plaintiff as to the plat restrictions at any point over the ensuing year and a half, during which period Plaintiff incurred substantial expense consistent with his intent to construct a single residence across Lots 1 and 12, including but not limited to causing the highly desirable and beautiful house on Lot 1 to be demolished, hiring designers, architects, and engineers to develop plans for the construction of a single residence, and seeking and gaining the approval of the architectural review commission of the Town of Palm Beach to construct a single residence straddling the common boundary line of the lots. (See, e.g., Expert Report of Ronald A. Patella.)

In a misguided and factually unsupported attempt to portray the nature of Plaintiff's real estate transactions in Palm Beach as being based "on a whim," the Lawyer Defendants point to Plaintiff's subsequent efforts to acquire additional residential property in the area. (See, e.g., Mot. Summ. J. at 4.) In addition to being wholly irrelevant to the issue of the Lawyer Defendants' negligence in their representation of Plaintiff in connection with Lots 1 and 12 Via Vizcaya, Plaintiff's attempts to purchase additional real estate actually provide support for the fact that Plaintiff's sole intent in acquiring property in Palm Beach, of which the Lawyer Defendants were fully aware at all times relevant to this action, was to construct a single residence on waterfront property with substantial water frontage. Specifically, the Lawyer Defendants note that Plaintiff unsuccessfully attempted to purchase Lot 2, Lot 3, and Lot 11 in the Via Vizcaya subdivision, as if Plaintiff simply was trying to accumulate random property in the area. (Id.) However, the Lawyer Defendants omit mention of the fact that Lots 2, 3, and 11 are all contiguous with Lots 1 and 12, thus evidencing Plaintiff's intent to acquire what ultimately would become one parcel with significant water frontage on which Plaintiff could construct a single residence. (See Furman Depo. at 21-22, 91-92.)

The Lawyer Defendants also note that Plaintiff attempted to purchase property located at 770 South County Road subsequent to the closing on the sale of the Via Vizcaya property. (Mot. Summ. J. at 4.) However, again, this only further demonstrates Plaintiff's intent with respect to his acquisition of property in Palm Beach, as Plaintiff only pursued the South County Road property because it would have given Plaintiff substantial water frontage and greater depth on which Plaintiff could construct his home than that available with respect to Lots 1 and 12 Via Vizcaya. (Furman Depo. at 23, 109.) The Lawyer Defendants also misleadingly suggest that their breach of duty is somehow moderated by Plaintiff's decision to put the Via Vizcaya

6

property up for sale after contracting to purchase the South County Road property. (Mot. Summ. J. at 7.) However, that assertion directly contradicts the Lawyer Defendants' argument that Plaintiff's goal with respect to his real estate transactions in Palm Beach was to "'accumulate' property." (Id. at 4.) Plaintiff only decided to try to sell the Via Vizcaya property when he believed that he would be able to acquire another property that would provide him with comparable water frontage and greater depth than provided by the Via Vizcaya property, consistent with his intent to construct a single residence on a property with substantial water frontage. (Furman Depo. at 109.) Indeed, the Lawyer Defendants' allegation that Plaintiff's goal was to "'accumulate' property" is a mischaracterization of the testimony of Plaintiff's real estate broker, who actually testified, consistent with Plaintiff's intent, that Plaintiff's goal was "to accumulate all this [water] frontage." (Furman Depo. at 91.) Interestingly, when Plaintiff's real estate broker listed the Via Vizcaya property for sale, the lots were advertised as one large waterfront parcel suitable for the construction of a single residence across the lots, which further demonstrates that no one who had any association with the acquisition or attempted sale of Lots 1 and 12 was ever advised by the Lawyer Defendants that plat setback restrictions prohibited the construction of a single residence across the boundary lines of the lots. (Id. at 35-37.)

Approximately 20 months after Plaintiff first became involved in the acquisition of property in the Via Vizcaya subdivision, as Plaintiff was in the process of unsuccessfully attempting to purchase Lots 2 and 3 Via Vizcaya, which were contiguous to the parcel formed by Lots 1 and 12, the Lawyer Defendants finally became aware of their failure to identify the plat restrictions impacting the properties in the Via Vizcaya subdivision. In connection with the acquisition of Lots 2 and 3, the Lawyer Defendants apparently inspected the plat of Via Vizcaya, which clearly and immediately revealed the setback lines prohibiting construction within ten feet of the side boundaries of each property in the subdivision. Rather than admitting their omissions to Plaintiff upon realizing their mistake, the Lawyer Defendants engaged in a curious cover-up that only served to prolong their negligence and the discovery thereof. In drafting addenda to the contract for Lots 2 and 3, the Lawyer Defendants inserted language conditioning the sale on the resolution of the plat restrictions affecting Lots 1 and 12, despite the fact that the entirely unrelated contracts for Lots 1 and 12 had been executed and closed on over a year and a half previously. (See, e.g., Furman Depo. at 27, et seq.) When questioned about such a bizarre tactic in subsequent conversations with Plaintiff and his real estate brokers, the Lawyer Defendants still

7

refused to admit to their errors, instead attempting to advance the incoherent explanation that the plat restrictions affecting Lots 1 and 12 were somehow different from those affecting Lots 2 and 3 and that Plaintiff would still have no problem constructing a single residence across the lots.[2] (Id.) Thus, even at such a late date, close to two years after Plaintiff first contracted to purchase property in Via Vizcaya, the Lawyer Defendants failed to advise Plaintiff that he could not construct a single residence across Lots 1 and 12, as was his intent. (Id. at 30.) Rather than involving a separate and unrelated set of circumstances, as alleged by the Lawyer Defendants in their Motion for Summary Judgment on Amended Complaint (Mot. Summ. J. at 11, 15), the Lawyer Defendants' cover-up instead actually served as a continuation of the same negligence, i.e., the Lawyer Defendants' ongoing failure ever to advise Plaintiff of the plat restrictions impacting the Via Vizcaya property.

In addition to the facts set forth above demonstrating the Lawyer Defendants' professional and gross negligence, the Lawyer Defendants also inadequately represented Plaintiff in connection with his inquiry into a possible appeal of the property tax assessment with respect to the Via Vizcaya property, giving rise to Plaintiff's claim against the Lawyer Defendants for breach of fiduciary duty. As Plaintiff had caused the existing residences on Lots 1 and 12 to be demolished due in part to the ineffectual advice of the Lawyer Defendants, Plaintiff recognized that the assessed value of the properties should be decreased by virtue of the fact that the lots were vacant. Accordingly, Plaintiff requested that the Lawyer Defendants look into the possibility of pursuing a property tax appeal involving the Palm Beach County Property Appraiser. (See email dated July 31, 2007, and replies thereto, Plaintiff's Exhibit 182.) In response, the Lawyer Defendants performed an internal firm conflict search, which revealed that the Lawyer Defendants had previously represented the County in connection with public finance matters. (See, e.g., emails dated August 27, 2007, Plaintiff's Exhibit 184.) Rather than disclosing to Plaintiff the existence of the potential conflict and giving Plaintiff the opportunity to retain separate counsel in connection with any property tax appeal, the Lawyer Defendants simply advised Plaintiff, without any basis offered in support, that there was no merit to Plaintiff's tax assessment challenge, causing Plaintiff, who relied on such advice, to abandon the

---

[2] The Lawyer Defendants attempted to advance this explanation despite the fact that all of the lots in the Via Vizcaya subdivision are subject to identical plat restrictions.

8

challenge without further inquiry. (See emails dated September 11, 2007, Plaintiff's Exhibit 191.)

The foregoing provides an accurate representation of the nature of the facts of the instant case and of the Lawyer Defendants' acts and omissions giving rise to Plaintiff's claims. The fact that the allegations of the events and circumstances of the case given by the Lawyer Defendants in their Motion for Summary Judgment on Amended Complaint, and the inferences to be drawn therefrom, vary dramatically from the actual facts of the case, as set forth above, is a clear indication both of the Lawyer Defendants' desperation to avoid liability for their wrongdoing and of the existence of genuine issues of material fact which preclude summary judgment. See Federal Rule of Civil Procedure 56. Moreover, in addition to mischaracterizing the applicable facts of the instant case, the Lawyer Defendants advance several legal arguments which are equally without merit and which will be addressed in detail infra.

## II. LEGAL ANALYSIS

Building on their mischaracterization of the facts of the instant case, the Lawyer Defendants also offer recycled legal arguments that have already been considered and rejected by the Court and inapposite and inaccurate principles of law which have no bearing on the case. First, the Lawyer Defendants argue that, despite the abundance of concrete evidence pertaining to the damages suffered as a result of the Lawyer Defendants' wrongdoing, the Lawyer Defendants should not be held liable for their negligence because Plaintiff's damages are speculative. Second, the Lawyer Defendants attempt to reassert their contention, already dismissed by this Court, that the Lawyer Defendants' conduct in the instant case does not rise to the level of gross negligence warranting the imposition of punitive damages. Third, the Lawyer Defendants again attempt to argue, despite the evidence to the contrary, that they did not breach their fiduciary duty to Plaintiff in connection with Plaintiff's potential property tax challenge. Each of these legal arguments is without merit and will be addressed in turn.

A. **The Lawyer Defendants' Argument That Plaintiff's Damages Are Speculative Is Not Supported by the Facts and Evidence of the Case**

The Lawyer Defendants, despite having the burden as the party moving for a summary judgment to prove affirmatively and conclusively that Plaintiff has not suffered damages, have failed to offer any support for their contention that Plaintiff's damages are speculative. See, e.g., Continental Concrete, Inc. v. Lakes at La Paz III Limited Partnership, 758 So.2d 1214, 1217

9

(Fla. 4th DCA 2000) ("The burden to conclusively prove the nonexistence of a material fact is on the moving party.") To the contrary, the overwhelming weight of the evidence demonstrates that Plaintiff has incurred real and substantial damages as a proximate result of the Lawyer Defendants' negligence.

As a threshold matter, the Lawyer Defendants begin their argument by misstating the applicable standard for legal malpractice. The Lawyer Defendants cite to Silvestrone v. Edell, 721 So. 2d 1173, 1175 (Fla. 1998), a case which pertained to an instance of litigation malpractice, not transactional malpractice as in the instant case. The Eleventh Circuit has recognized that, in Florida, courts have applied a different standard to cases involving transactional malpractice from the standard applied to cases involving litigation malpractice. See Porter v. Ogden, Newell & Welch, 241 F.3d 1334, 1339 (11th Cir. 2001); see also Robbat v. Gordon, 771 So. 2d 631 (Fla. 4th DCA 2000) ("With respect to legal malpractice actions, Florida courts have consistently drawn a distinction between those malpractice actions arising from transactional work and those arising from errors or mistakes committed during the course of litigation."). Specifically, in a case involving transactional malpractice, a cause of action "accrues when 'it is reasonably clear that the client has actually suffered some damage from legal advice or services.'" Porter, 241 F.3d at 1339 (quoting Throneburg, III v. Boose, Casey, Ciklin, Lubitz, Martens, McBane & O'Connell, P.A., 659 So. 2d 1134, 1136 (Fla. 4th DCA 1995)). In the instant case, it is clear that Plaintiff has suffered significant damage as a result of the legal advice and services provided by the Lawyer Defendants.

As a direct and proximate result of the Lawyer Defendants' ongoing failure to advise Plaintiff of the plat restrictions impacting Lots 1 and 12 Via Vizcaya which prevented Plaintiff from constructing a single residence across the lots as he intended, Plaintiff suffered substantial quantifiable damages. Specifically, by way of illustration, believing that the acquisition of Lot 12, when combined with Lot 1, would give Plaintiff significant water frontage on which he could construct a single residence, Plaintiff paid a premium of nearly two million dollars to purchase Lot 12. (See Deposition of Michael Spaziani, January 8, 2009 ("Spaziani Depo.") at 38.) As the Lawyer Defendants failed to advise Plaintiff of the plat restrictions prior to the May 1, 2006, closing on the Via Vizcaya property, Plaintiff incurred costs and expenses associated with the closing on Lot 12, as well as carrying costs associated with Lot 12 including property taxes, mortgage payments, and maintenance costs, which continue to accrue on the property as of the

10

date of this filing. (See Expert Report of Ronald A. Patella.) Plaintiff also incurred considerable expenses in the payment of design, architectural, and engineering fees in the preparation of plans to construct a single residence on the Via Vizcaya property, and in the payment of legal and other fees incurred in obtaining the approval of the Town of Palm Beach to build the house, expenses which Plaintiff certainly would not have incurred if the Lawyer Defendants had ever advised him that he could not build one residence on the property. (See, e.g., Id.)

The Lawyer Defendants' assertion that they should bear no liability for the demolition of the house on Lot 1 because the decision to demolish was made "long after the purchase decisions were made" (Mot. Summ. J. at 7) incongruously attempts to limit the Lawyer Defendants' negligence to the period of time surrounding Plaintiff's acquisition of the Via Vizcaya property. To the contrary, as indicated supra, the Lawyer Defendants' negligence involved their ongoing failure to advise Plaintiff of the relevant plat restrictions over a period of almost two years, during which time the demolition of the house on Lot 1 took place. Indeed, the fact that Plaintiff made the decision to have the house on Lot 1 demolished subsequent to its acquisition is further evidence that Plaintiff, while being advised by the Lawyer Defendants, continued to be under the belief that he would be able to construct a single residence straddling the boundary line between Lots 1 and 12.

Furthermore, with respect to the issue of the damages incurred by Plaintiff, the Lawyer Defendants allege that Plaintiff should not be able to recover the full amount of his damages because Plaintiff would "then turn around and sell the properties at a profit." (Mot. Summ. J. at 3.) Although the subsequent fluctuations in value of the Via Vizcaya property is of no relevance to a determination of Plaintiff's damages, see, e.g., Palmer v. Woods, Case No. 83-1388 Civ-T-10, 1988 U.S. Dist. LEXIS 15840 (M.D. Fla. November 7, 1988) (holding that damages in a professional malpractice case are measured from the date of the breach of duty), it is worth noting that Lot 12 of Via Vizcaya is currently offered for sale at a price of $1,200,000.00 less than Plaintiff paid for the property.[3] (See Affidavit of Richard Kurtz, attached hereto as Exhibit "A".) Moreover, to date, Plaintiff has received no offers for purchase of either Lot 1 or Lot 12.

---

[3] The Lawyer Defendants also devote a lengthy footnote to explaining their belief that if Plaintiff were to engage in costly and time-consuming litigation to challenge the plat restrictions affecting Lots 1 and 12 Via Vizcaya, the value of the properties might increase. For support, the Lawyer Defendants attach the property appraisal for the property located at 770 South County Road, which was involved in a challenge of certain restrictions dissimilar to those involved in the instant case. The Lawyer Defendants point to the purported increase in value of the property by over one million dollars in the year following the successful litigation as some sort of indication that the Via Vizcaya

11

Based on the foregoing, it is clear that Plaintiff has suffered concrete and substantial damages as a direct and proximate cause of the Lawyer Defendants' ongoing failure to advise Plaintiff of the plat restrictions impacting the Via Vizcaya property. Accordingly, summary judgment based on the Lawyer Defendants' argument that Plaintiff's damages are speculative is not appropriate.

**B.    The Lawyer Defendants' Argument That Their Conduct Does Not Amount to Gross Negligence Is Not Supported by the Applicable Law**

As a further indication that the Lawyer Defendants are straining to advance a comprehensible argument in favor of summary judgment, the Lawyer Defendants recycle their contention, recently considered and rejected by this Court in connection with Plaintiff's request to amend his Complaint so as to assert a claim for punitive damages, that their conduct in the instant case did not rise to the level necessary to support a finding of gross negligence. As they have done consistently since the issue of their gross negligence was raised, the Lawyer Defendants misrepresent the applicable standard supporting a finding of gross negligence and an award of punitive damages.

In arguing in opposition to Plaintiff's claim against the Lawyer Defendants for gross negligence, the Lawyer Defendants advance a standard of gross negligence that has been superseded by amendment to the Florida Statutes. In 1999, the Florida legislature amended Section 768.72 of the Florida Statutes to enable a plaintiff to recover punitive damages where the defendant's acts or omissions amounted to gross negligence, defined as follows: "'Gross negligence' means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Although the Lawyer Defendants argue in their Motion for Summary Judgment on Amended Complaint that a finding of gross negligence requires willful misconduct (see Mot. Summ. J. at 10), this argument directly contradicts the clear and unambiguous language of Section 768.72(2)(b) of the Florida Statutes. It is no coincidence that for support of

---

properties might similarly increase in value if similar litigation were undertaken with respect to those properties. Without addressing the complete irrelevance of the 770 South County Road litigation, which involved vastly different factual circumstances from those of the instant case, it suffices to note that the Lawyer Defendants offer no support for their contention that the increase in value was due to the successful litigation and not an overall rise in property values in the area. Indeed, the property appraisal attached by the Lawyer Defendants indicates that in a subsequent year, the appraised value of the property increased by over *4 million dollars*. The Lawyer Defendants fail to point out what litigation they believe was responsible for *that* dramatic increase in value. Needless to say, these appraised values represent activity occurring prior to the recent economic downturn.

12

their contention that their conduct did not rise to the level of gross negligence, the Lawyer Defendants cite to a number of cases decided prior to the Florida legislature's 1999 amendment to the punitive damages statute. See IBP, Inc. v. Hady Enterprises, Inc., 267 F. Supp. 2d 1148, 1170 (N.D. Fla. 2002) (finding that Florida cases requiring a showing of willful conduct for an award of punitive damages were not persuasive as they were decided before the 1999 amendment of Section 768.72).

Rather than requiring willful or intentional conduct, Section 768.72(2) makes clear that conduct showing a want of care can amount to gross negligence, thereby allowing an award of punitive damages. The language in Section 768.72(2)(b) closely mirrors the language used to describe the defendant's gross negligence in Griffith v. Shamrock Village, 94 So. 2d 854 (Fla. 1957), a case heard by the Supreme Court of Florida which gives a clear explanation of the gross negligence standard adopted by the Florida legislature's 1999 amendment of the punitive damages statute. Remarkably, the Lawyer Defendants attempt to describe Griffith as standing for the proposition that a plaintiff may recover punitive damages "due to the willful and grossly unreasonable conduct of the defendant." (Mot. Summ. J. at 10.) Quite to the contrary, the Supreme Court of Florida expressly points out that the "[p]laintiff did not allege nor prove that defendant acted or failed to act from malice *or willfully*." 94 So. 2d at 858 (emphasis added). Rather, Griffith involved imputing conduct meriting a punitive damages award to the defendant on the basis of the defendant's "entire want of care or attention to duty, or great indifference to the persons, property or rights of others." Id.; see also, Fla. Stat. §768.72(2)(b). To the extent that the Lawyer Defendants argue that cases subsequent to Griffith elevated the punitive damages standard to require willful or intentional conduct, the 1999 amendment to Section 768.72 supersedes that line of cases. See Hady Enterprises, 267 F. Supp. 2d at 1170.

In addition, the Lawyer Defendants' argument that this Court should disregard cases outside of the legal malpractice context which describe a relatively low standard of liability for gross negligence is without merit. The Florida supreme court has held that "absent legislative intent to the contrary, 'the basic principles for all professional malpractice actions should be the same.'" Robbat v. Gordon, 771 So. 2d 631 (Fla. 4th DCA 2000) (quoting Peat, Marwick, Mitchell & Co. v. Lane, 565 So. 2d 1323 (Fla. 1990)). The Florida legislature has not provided for a distinction to be drawn based on occupation in its statutory sections describing punitive damages and the gross negligence standard. Thus, the Lawyer Defendants' request that the

13

Court should restrict its consideration primarily to cases involving legal malpractice, without regard to other professional malpractice cases or other more general gross negligence cases, is inappropriate.

Moreover, equally without merit is the Lawyer Defendants' argument that this Court should not consider evidence of the Lawyer Defendants' cover-up of their wrongdoing, as described supra, in its evaluation of Plaintiff's claims against the Lawyer Defendants for gross negligence and punitive damages, on the grounds that the cover-up supposedly amounted to a separate incident unconnected to their failure to advise Plaintiff of the subject plat restrictions. The Lawyer Defendants devote nearly five pages of their Motion for Summary Judgment and cite to several cases in support of a legal argument that makes for interesting reading, but which is wholly irrelevant to the instant action. The crux of the Lawyer Defendants' contention is that their attempted cover-up, whereby the Lawyer Defendants inexplicably drafted addenda to a purchase contract for Lots 2 and 3 Via Vizcaya which conditioned the sale on the cure of the restrictions encumbering Lots 1 and 12, amounted to an entirely separate and unrelated incident. Thus, the Lawyer Defendants are arguing that to hold them accountable for the cover-up would constitute "a denial of due process" (Mot. Summ. J. at 11), in that the cover-up did not relate to the Lawyer Defendants' failure to advise Plaintiff of the plat restrictions.

In support of this argument, the Lawyer Defendants cite to several cases, a brief review of which clearly reveals the inapplicability of the principle expressed therein to the instant case. For example, in State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408, 422 (2003), the Supreme Court articulated the proposition that "[a] defendant's *dissimilar acts, independent from the acts upon which liability was premised*, may not serve as the basis for punitive damages" (emphasis added). Accordingly, the other cases to which the Lawyer Defendants cite all involve dissimilar acts from the acts giving rise to the cause of action. See Stroud v. Abington Memorial Hospital, 546 F. Supp. 2d 238 (E.D. Pa. 2008) (subsequent cover-up of medical malpractice); Richardson v. Tricom Pictures & Productions, Inc., 334 F. Supp. 2d 1303 (S.D. Fla. 2004) (evidence of retaliation against non-parties in a sexual harassment case); Burke v. Maassen, 904 F.2d 178 (3d. Cir. 1990) (evidence that truck driver who killed pedestrian lied on employment application). In each of these cases, the court disallowed consideration of entirely unrelated facts and circumstances in the determination of liability for punitive damages.

These cases, and the principle to which the cases adhere, are entirely irrelevant to the instant case, in which the Lawyer Defendants' cover-up did not involve dissimilar acts or some separate transaction or set of circumstances from those which gave rise to Plaintiff's claims. To the contrary, the Lawyer Defendants' cover-up merely served to prolong their ongoing negligence, specifically, their failure ever to advise Plaintiff of the existence of plat restrictions affecting Lots 1 and 12 Via Vizcaya which prevented Plaintiff from constructing a single residence across the lots. Upon their discovery of their negligence, instead of admitting to their errors and promptly advising Plaintiff of the plat restrictions, the Lawyer Defendants attempted to prevent Plaintiff from discovering the problem posed by the restrictions, thereby continuing the period of time during which the Lawyer Defendants failed to advise Plaintiff of the restriction. Rather than constituting a separate set of facts or dissimilar acts, as in the cases on which the Lawyer Defendants misplace their reliance, the Lawyer Defendants' cover-up is simply further evidence of the underlying professional and gross negligence giving rise to Plaintiff's claims. The Lawyer Defendants' cover-up was merely one interconnected part of the same continuous sequence of events supporting Plaintiff's claims.

Plaintiff has set forth a legitimate basis for his claim of gross negligence against the Lawyer Defendants, and there exist genuine issues of material fact relating to the Lawyer Defendants' conduct, including their attempted cover-up, and whether such conduct rises to the level of gross negligence. Accordingly, summary judgment based on the Lawyer Defendants' argument that their conduct did not amount to gross negligence is not appropriate.

### C. The Lawyer Defendants' Argument That They Did Not Breach Their Fiduciary Duty to Plaintiff in Connection with his Potential Tax Appeal is Without Merit

The Lawyer Defendants' argument that they did not breach their fiduciary duty to Plaintiff arising out of Plaintiff's inquiry into a potential appeal of the property tax assessment on the Via Vizcaya property is without merit and is not supported by the facts giving rise to Plaintiff's claim or a proper application of the relevant law to those facts. The Lawyer Defendants attempt to frame the issue as arising due to the Lawyer Defendants representing Plaintiff in an appeal against the Palm Beach County Appraiser while simultaneously representing the County in unrelated public finance matters. (See Mot. Summ. J. at 16-17.) Although this potential conflict of interest is tangentially important to Plaintiff's claim for breach of fiduciary duty, the real basis for Plaintiff's claim is not whether the Lawyer Defendants

15

actually in fact operated under a conflict of interest, but rather how the Lawyer Defendants acted and advised Plaintiff when *they* believed *themselves* to have a conflict. Plaintiff is not alleging that the Lawyer Defendants breached their fiduciary duty to Plaintiff simply by having a conflict of interest with respect to their prior representation of Palm Beach County. Rather, the Lawyer Defendants breached their duty by advising Plaintiff not to pursue his tax appeal for the reason that they *believed* they had a conflict of interest and did not want to have to lose Plaintiff as a client by referring him to another firm. (See, e.g., emails dated August 27, 2007, Plaintiff's Exhibit 184.)

The Lawyer Defendants cite to a comment to Florida Rule of Professional Conduct 4-1.13, relating to the representation of related organizations, to attempt to establish the absence of a conflict and therefore the absence of a breach of fiduciary duty. (Mot. Summ. J. at 16-17.) Without addressing the implication that only by violating a Rule of Professional Conduct can an attorney breach a fiduciary duty, it suffices to point out again that the issue is not whether the Lawyer Defendants actually were in conflict. Rather, Plaintiff's claim for breach of fiduciary duty arises from the fact that the Lawyer Defendants *believed* they were in conflict and, instead of advising Plaintiff of the potential conflict and referring him to other counsel with respect to the tax appeal, they simply advised Plaintiff that his appeal should not be pursued. (See emails dated September 11, 2007, Plaintiff's Exhibit 191.)

In addition, the Lawyer Defendants contend that even if they did breach their fiduciary duty to Plaintiff, summary judgment is appropriate because Plaintiff would not be able to establish damages. This argument is without merit. In accordance with the Lawyer Defendants' representations to Plaintiff regarding his acquisition and development of the subject lots in this case, Plaintiff had the existing improvements on the property demolished and requested that the Lawyer Defendants pursue an appeal of the property tax assessment on the lots so as to accurately reflect the downward adjustment of the value of the lots without existing improvements. (See email dated July 31, 2007, and replies thereto, Plaintiff's Exhibit 182.) Rather than agreeing with the Palm Beach County Property Appraiser's assessment of the value of the lots, as the Lawyer Defendants contend (Mot. Summ. J. at 18), Plaintiff's expert property appraiser has testified that the County Appraiser frequently misstates the true value of property (Spaziani Depo. at 52-53) and that Plaintiff has suffered real and substantial damages as a result of the Lawyer Defendants' breach of fiduciary duty. At the very least, Plaintiff has demonstrated

16

a genuine issue of material fact with respect to the damages issue sufficient to survive a summary judgment.

Thus, as Plaintiff has established the existence of genuine issues of material fact relating to his claim against the Lawyer Defendants for breach of fiduciary duty, summary judgment with respect to the claim is inappropriate.

### III. CONCLUSION

As there exist genuine issues of material fact which render summary judgment inappropriate pursuant to Federal Rule of Civil Procedure 56(c), this Court should enter an Order denying Lawyer Defendants' Motion for Summary Judgment on Amended Complaint.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 4th, 2009, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day via Electronic Filing and U.S. Mail on David P. Ackerman, Esq., 222 Lakeview Avenue, Suite 1250, West Palm Beach, FL 33401.

**GRANER & HEIMOVICS, P.A.**

By: /s/ Thomas U. Graner
Thomas U. Graner (905577)
tom@gh-law.net
399 W. Palmetto Park Road, Suite 100
Boca Raton, Florida 33432
(561) 750-2445 Telephone
(561) 750-2446 Facsimile
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 08-80355-CIV-HURLEY/HOPKINS

RICHARD KURTZ,
a New Jersey resident,

      Plaintiff,

v.

GREGORY E. YOUNG, individually,
G.E.YOUNG, P.A., a Florida corporation,
EDWARDS, ANGELL, PALMER,
& DODGE, LLP, a Delaware limited liability
partnership, and RENNER, BURGESS, INC.,
a Florida corporation,

      Defendant(s).
_____/

## PLAINTIFF'S, RICHARD KURTZ, AFFIDAVIT IN OPPOSITION TO LAWYER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STATE OF NEW JERSEY   )
COUNTY OF BERGEN     ) ss

      BEFORE ME, this day personally appeared RICHARD KURTZ, who being duly sworn, deposes and says that the following information is true and correct based on his personal knowledge and states as follows:

      1.    My name is RICHARD KURTZ. I am competent to provide this affidavit, which is based on my own personal knowledge. I am the Plaintiff in the above-referenced action.

      2.    On March 17, 2009, I listed for sale Lot 12 Via Vizcaya, Palm Beach, Florida, with Linda A. Gary Real Estate, Inc. at a listing price of $5,800,000.00.

      3.    To date, no offers have been received for this listing

      4.    To date, the property remains listed for sale at this price.

Exhibit  A

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
RICHARD KURTZ

Subscribed and sworn to before me this ____ day of May, 2009 by RICHARD KURTZ, and he is: either _____ Personally known to me; or _____ he has produced _____ as identification and who did take an oath.

_____
NOTARY PUBLIC, State of New Jersey

(Seal)

MARGARET SPAGNOLA
Notary Public of New Jersey
My Commission Expires 7/16/2010